## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| ORYX AFGHANISTAN,<br>FARHAN YUSEFZAI,<br><br>*Plaintiffs*,<br><br>v.<br><br>CONSTELLIS, LLC<br>TRIPLE CANOPY, INC.<br>ACADEMI LLC<br>EDINBURGH INTERNATIONAL RMC LLC<br>OLIVE GROUP NORTH AMERICA, LLC,<br><br>*Defendants*. | Case Number: 1:26-cv-548 |

### COMPLAINT

Plaintiffs, Oryx Afghanistan ("Oryx") and Farhan Yusefzai ("Yusefzai"), file this Complaint against Defendants, Constellis, LLC ("Constellis"), Triple Canopy, Inc. ("Triple Canopy"), Academi LLC ("Academi"), Edinburgh International RMC LLC ("Edinburgh"), and Olive Group North America, LLC ("Olive Group"), and in support thereof, state as follows:

### NATURE OF THE ACTION

1.      This case arises from Defendants' intentional, unlawful, and reckless storage of thousands of illegal firearms and explosives at Camp Oryx, Afghanistan in breach of both their contractual and legal duties. This illegal conduct, exacerbated by Defendants' refusal to take responsibility for the crisis they created, foreseeably led to the violent seizure of the camp by the Taliban and the torture of its employees.

2.      Camp Oryx, a logistics and lodging facility supporting U.S. government contractors in Kabul, was owned by Plaintiff Farhan Yusefzai and operated by Plaintiff Oryx. Under binding agreements, Defendants were permitted limited use of the premises, subject to strict compliance with applicable law. Defendants far exceeded the scope of their authority, however, secretly storing and concealing numerous illegal heavy weapons and explosives, unregistered firearms, and ammunition inside locked containers on the property.

3.      Even worse, as Defendants fled from Afghanistan in the face of the Taliban's imminent takeover, they chose to abandon these contraband weapons on Plaintiffs' property without warning them of the acute danger they were leaving behind. Their reason? As Defendants wrote in their internal memos, they were worried that informing Oryx or the Afghan government would expose themselves to financial penalties or require them to repurchase the weapons. In the eyes of the Defendants, these concerns outweighed the dangers they were leaving for Oryx and its employees, to which they appeared utterly indifferent.

4.      When Taliban forces eventually seized Kabul, they inspected Camp Oryx and found locked containers that the Defendants had left behind. When they forcibly opened the containers, they discovered the huge cache of illegal and unregistered weapons, explosives, and ammunition. Concluding that it must have been a clandestine U.S. military base, the Taliban declared Camp Oryx "war booty" and promptly confiscated it.

5.      Defendants had the opportunity, at Plaintiffs' urgent request, to show the Taliban that Defendants had the authority to possess the weapons or, if they did not, to explain why they were at Camp Oryx, a private, non-military logistics site. Had they done either, Camp Oryx would not have been seized.  But instead of mitigating the crisis as their contracts with Oryx

required, Defendants ignored Plaintiffs' pleas. As a result, the Taliban detained and tortured members of Plaintiffs' staff and permanently converted Camp Oryx—the real property, the improvements, and vehicles, equipment, and other personal property on it—to Taliban use. Predictably, Plaintiffs' business was destroyed. These catastrophic harms were the direct and natural consequence of Defendants' contractual breaches and unlawful and ultra-hazardous misuse of Plaintiffs' property. Through this action, Plaintiffs seek a measure of justice for Defendants' illegal contract breaches and tortious misconduct.

**PARTIES**

6.      Plaintiff Oryx is a limited liability corporation organized under the laws of Afghanistan that, at all times relevant to this dispute, operated an approximately 15-acre secure site outside of Kabul, Afghanistan known as Camp Oryx.

7.      Plaintiff Yusefzai is the CEO of Oryx and, in his individual capacity, was the owner of the Camp Oryx property immediately prior to its seizure by the Taliban in August 2021. Plaintiff Yusefzai is a citizen of the United Kingdom and is domiciled in the United Arab Emirates.

8.      Defendant Constellis is a Delaware limited liability company with a principal place of business located at 13530 Dulles Technology Drive, Herndon, Virginia 21071 and a Virginia registered agent located at 100 Shockoe Slip Fl. 2, Richmond, Virginia 23219. Constellis is a privately held U.S.-based security and risk management company that provides a range of services to government and commercial clients worldwide, including as private security, which operates primarily through its wholly owned subsidiaries such as Defendants Academi, Triple Canopy, Olive Group, and Edinburgh.

9.    Defendant Academi is a Delaware limited liability company with a principal place of business located at 13530 Dulles Technology Drive, Herndon, Virginia 21071 and a Virginia registered agent located at 100 Shockoe Slip Fl. 2, Richmond, Virginia 23219. Academi is a wholly owned subsidiary of Constellis.

10.    Defendant Edinburgh is a Delaware limited liability company with a principal place of business located at 13530 Dulles Technology Drive, Herndon, Virginia 21071 and a Virginia registered agent located at 100 Shockoe Slip Fl. 2, Richmond, Virginia 23219. Edinburgh is a wholly owned subsidiary of Constellis.

11.    Defendant Olive Group is a Delaware limited liability company with a principal place of business located at 13530 Dulles Technology Drive, Herndon, Virginia 21071 and a Virginia registered agent located at 100 Shockoe Slip Fl. 2, Richmond, Virginia 23219. Olive Group is a wholly owned subsidiary of Constellis.

12.    Defendant Triple Canopy is an Illinois corporation with a principal place of business located at 13530 Dulles Technology Drive, Herndon, Virginia 21071 and a Virginia registered agent located at 100 Shockoe Slip Fl. 2, Richmond, Virginia 23219. Triple Canopy is a wholly owned subsidiary of Constellis.

## JURISDICTION & VENUE

13.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(2), because Plaintiffs are citizens or subjects of foreign nations and Defendants are corporate entities organized under the laws of States (Delaware and Illinois) and having a principal places of business in Virginia, and because the amount in controversy exceeds $75,000.

14.    The Court has personal jurisdiction over Defendants because each Defendant (1) has its principal place of business in Virginia; (2) has a registered agent in Virginia; (2) has systematic and continuous contacts with Virginia; and (4) entered into contractual agreements "governed by the laws of the Commonwealth of Virginia" that are the subject of this action.

15.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because all Defendants are corporations subject to personal jurisdiction in this District and thus reside in this District within the meaning of 28 U.S.C. § 1391, and because the parties agreed to submit any dispute arising out of the contract to the "venue . . . in the federal and state courts in Fairfax County, Commonwealth of Virginia. . . ."

## FACTUAL BACKGROUND
### Constellis's operations

16.    Since 2004, Constellis and its subsidiaries have provided protective security services to customers in Afghanistan, including non-governmental, private, and various government organizational clients, receiving billions of dollars from the U.S. Government alone.

17.    By March 4, 2018, Constellis claimed that it and its subsidiaries held "over 41 active contracts, valued at more than $1.8 billion, providing over 4,000 security professionals across Afghanistan."

### Camp Oryx

18.    Plaintiff Oryx is a subcontracting company that provided critical support services such as lodging, meals, and storage services to companies (such as Defendants) that provided services to the United States Government in Afghanistan.

19.     Camp Oryx was a logistical hub spanning approximately two large city blocks and comprised of warehouses, bunkrooms, open storage areas, food and recreational facilities, and a helipad.

20.     Camp Oryx was owned by Plaintiff Yusefzai and used exclusively by Plaintiff Oryx, a company that Yousefzai founded to profitably operate Camp Oryx and other similar facilities in Afghanistan.

21.     Oryx had 10 to 20 employees at Camp Oryx in the period of 2018 to August 2021.

### Constellis moves to Camp Oryx and immediately breaches its contract by bringing unregistered weapons

22.     On October 13, 2018, Constellis contracted with Oryx's parent company, Khidmat Trident Group, for permission to (1) use Camp Oryx for room, board, laundry, office space, and recreational services for up to 20 individuals; (2) use its helipad; and (3) store containers in the unoccupied grounds that covered approximately half of the site. Ex. A ("October 2018 LSA"). The period of performance defined in the October 2018 LSA was October 13, 2018 "through the time the customer uses the facility." *Id.* at 6.

23.     Constellis moved into Camp Oryx in November 2018 and brought twenty-two storage containers ("Constellis Containers"). The Constellis Containers were locked, and only Defendants had the means to access and unlock these containers.

24.     The October 2018 LSA required Constellis to register its assets (including firearms) with the Afghan government and to take full responsibility of the assets within the regulatory framework of the Afghan government. *Id.* at 5.

25.     Constellis immediately violated this provision by bringing unregistered firearms to Camp Oryx in the Constellis Containers in violation of Afghan law.

26.    Unbeknownst to Oryx, Constellis had been seeking a solution for unregistered weapons stored at another facility, Camp Integrity, where Afghan officials had begun to look into illegal weapon storage. Constellis's "solution" was simply to transfer the weapons, and weapons from other Constellis sites, to Camp Oryx.

27.    Within hours of Constellis moving the containers from Camp Integrity to Camp Oryx, Afghan law enforcement appeared at Camp Oryx's gate demanding access to the facility to search for illegal weapons. Upon learning of the presence of illegal weapons, Oryx worked with Constellis to separate and remove them from Camp Oryx.

28.    Yousefzai, as CEO of Oryx, sternly warned Constellis personnel, including Richard Rice (Constellis's Afghanistan Country Manager), and David Marshall (Constellis's Business Development Manager), that the storage of illegal and unregistered weapons at Camp Oryx was prohibited and would not be tolerated.

29.    After the removal of weapons in November 2018, Constellis's personnel, including Richard Rice and David Marshall, told Yusefzai that Constellis was no longer storing illegal or unregistered weapons at Camp Oryx and would not do so going forward.

30.    As a result of these violations, Oryx and Triple Canopy signed a new agreement on November 10, 2018. Ex. B ("November 2018 LSA").

31.    The November 2018 LSA included language making even more explicit that Triple Canopy was obligated to follow the laws of Afghanistan and obligated to refrain from bringing illegal weapons to Camp Oryx. Specifically, the November 2018 LSA required Triple Canopy to "inform the facility and security managers if there are hazards equipment stored at the facility including firearms"; stated that "Oryx Afghanistan reserves the right to investigate and

remove any and all equipment deemed illegal or found to not have the proper registration and licensing"; and stated that "[i]f Oryx Afghanistan discovers this policy has been violated, Oryx Afghanistan reserves the right to terminate this contract immediately and remove all personnel and equipment form Camp Oryx." *Id*. at 6.

32.    In addition, in January 2019, Constellis affirmatively provided Oryx with Constellis' Code of Business Ethics and Conduct ("COBEC") for Oryx's acceptance and signature, with an effective date of November 21, 2018. Relevant excerpts of the COBEC are attached as Ex. C.

33.    Defendants' COBEC communicated clearly their intentions with respect to any contract in which they might engage, including:

- "A solid commitment to compliance and ethical behavior is the foundation of our company. . . . A culture of integrity requires . . . compliance with laws and regulations. . . . The Code communicates our context and intent and reiterates our expectations for all personnel, contractors, agents, . . . and anyone else representing or acting on behalf of Constellis." Ex. C at 2.

- Constellis "and its affiliates . . . are committed to conducting business . . . in accordance with applicable laws and regulations of the United States and other countries and jurisdictions in which we operate. . . . All Constellis and affiliated company personnel or third parties acting on behalf of Constellis who receive this Code are obligated to follow its provisions." *Id*. at 3.

- "Constellis has developed and implemented a set of policies, procedures and controls . . . to ensure the company conforms to standards included under the ANSI/ASIS PSC.1 Management System for Quality of Private Security Company Operations . . . ." *Id*. at 4.

- "Suppliers and subcontractors shall make representations that they will abide by and be held responsible for . . . complying with applicable laws and regulations." *Id*. at 5.

- "When a contract requires Constellis personnel to carry firearms, the Company will acquire and maintain authorizations required by appliable law for the possession and use of any firearms and ammunition. . . . Constellis personnel shall not possess nor use firearms or ammunition that are illegal under any applicable law." *Id*. at 7.

- "Constellis personnel shall not engage in any illegal firearms transfers and will conduct any firearms transactions in accordance with applicable laws and United Nations Security Council requirements, including sanctions." *Id.*

Through multiple iterations and modifications of the various contracts through which it received services at Camp Oryx, including the conditional rights to access and use storage space, Constellis never modified the terms of its COBEC and never indicated that it, its affiliates, or Oryx would no longer be obligated to abide by its provisions.

34.    On July 10, 2019, Oryx and Constellis entered into (a) a new agreement based upon a standard form "Vendor Services Agreement" ("VSA") that Constellis used regularly, and (b) a Work Order under the VSA. Ex. D ("2019 VSA").

35.    Although the standard form VSA did not contain the specific language regarding notice and inspection of weapons that had been included in the November 2018 LSA, Constellis's contractual and independent obligations to follow Afghan law and to refrain from bringing unregistered or illegal weapons remained in effect.

36.    After the 2019 VSA, Plaintiffs no longer had a contractual right to inspect the contents of the Constellis storage containers, which were locked by Constellis and stored behind a secured fence monitored with CCTV cameras.

37.    However, based on Constellis's representations and covenants following the breach of the October 2018 contract—i.e., Constellis's promise that it would no longer bring unregistered or illegal weapons onto Camp Oryx, its incorporation of the COBEC into the parties' agreements, and provision and execution of a standard VSA form requiring (as explained more fully below) that Constellis store only legal weapons—Oryx reasonably believed that

Constellis had in fact stopped storing unregistered or otherwise illegal weapons in the Constellis Containers.

38.    At no time prior to August 2021 did Constellis inform Plaintiffs that it was, yet again, storing unregistered weapons or any heavy weapons or explosives in the Constellis Containers.

### Rise of the Taliban and the planned U.S. withdrawal

39.    The Taliban, which first rose to power in 1995, is a militant organization focused on enforcing its vision of certain extremist, religious values.

40.    Experts frequently characterize the Taliban's reign as synonymous with systemic human rights violations.

41.    Multiple governments have characterized the Taliban, both during its early reign and today, as a terrorist organization.

42.    After being overthrown by the U.S. military after the September 11 attacks, the Taliban began making territorial gains in the mid-2010s, including seizing the city of Kunduz in September 2015—the first provincial capital to fall under Taliban hands since 2001.

43.    By the time of the October 2018 LSA between Constellis and Oryx's parent, the Taliban controlled or contested approximately 40% of Afghanistan and continued to make gradual territorial gains.

44.    On or about February 29, 2020, the United States and the Taliban entered into the U.S.-Taliban Agreement. To reflect the United States's official policy, which views the Taliban as an illegitimate government, the agreement referred to the Taliban throughout the document as the "Islamic Emirate of Afghanistan which is not recognized by the United States as

a state and is known as the Taliban." In the agreement, the United States agreed to withdraw all troops from Afghanistan by May 2021, which was later extended to September 2021.

45.     Taliban propaganda celebrated the February 2020 deal with the United States as a major victory and urged supporters to continue armed jihad in its website publication, "The Voice of Jihad." *See* Seth Jones, "*Afghanistan's Future Emirate? The Taliban and the Struggle for Afghanistan*," (CTC Sentinel, November/December 2020), *available a*t https://perma.cc/C75L-GVKD.

46.     As early as March 2020, just days after the signing of the U.S.-Taliban Agreement, senior Taliban figure Mullah Fazl insisted in a speech to Taliban commanders that the movement was committed to establishing an "Islamic Emirate" based on the Taliban's interpretation of Sharia law. *Id*. Likewise, as documented by the United Nations Sanctions Monitoring Team Report, Taliban field commanders were informing civilian populations in March 2020 that they were confident of the "victory of the Islamic Emirate" and that the "Afghan government would be toppled within three months." *See Eleventh Report of the Analytical Support and Sanctions Monitoring Team Submitted Pursuant to Resolution 2501 (2019) Concerning the Taliban and Other Associated Individuals and Entities Constituting a Threat to the Peace, Stability and Security of Afghanistan,* United Nations Security Council, S/2020/415, May 27, 2020, p. 7, *available at* https://perma.cc/W6AF-MSV5.

47.     Shortly after the signing ceremony, and consistent with its stated goals of overthrowing the existing Afghan government, Taliban forces began increasing attacks against Afghan Forces countrywide. *Id*.

48. The Taliban's intention to take over Afghanistan and restore its government was known to Constellis no later than April 2020.

49. By January 2021, the United States had withdrawn their troops in Afghanistan to the lowest levels since 2001.

50. By at least early February 2021 (nearly a year after the U.S.-Taliban Agreement), the Taliban began discussing publicly what they had been telling commanders and civilians all along: that they intended to replace the existing Afghan government with an Islamic Emirate government based on Sharia law. *See, e.g.*, Sharif Amiry, *"'Islamic Govt to Replace Current Govt in Afghanistan': Taliban,"* TOLO News (Feb. 2, 2021), available at https://tolonews.com/afghanistan-169706.

51. By that point, it was not merely foreseeable, but was *in fact foreseen* by reasonably informed observers (including, on information and belief, by each of the Defendants) that the Taliban would indeed overthrow the Afghanistan government and conduct reprisals against those seen as collaborating with the United States if—as ultimately happened—the U.S. left Afghanistan without negotiating a deal between the Taliban and the Kabul government.

52. For example, in *A Failed Afghan Peace Deal: Contingency Planning Memorandum No. 37* (Council on Foreign Relations, July 2020), *available at* https://perma.cc/GUZ8-ARHB, Seth Jones of the Center for Strategic International Studies noted that "[i]t [was] unclear whether the Taliban [was] serious about reaching a deal or whether its leaders [were] negotiating simply to get U.S. troops to withdraw so that Taliban forces can overthrow the Afghan government," and warned that "[a] U.S. withdrawal from Afghanistan without a peace deal would significantly increase the level of violence in Afghanistan, risk a growing regional war,

trigger a humanitarian crisis, allow an extremist Islamic group to overrun Kabul, and raise serious questions among allies about U.S. reliability."

53.    Furthermore, it had been widely known for at least a decade that those who collaborated with foreign governments—and particularly with foreign troops—were at a high risk of retaliation by the Taliban. *See* Refugee Documentation Centre of Ireland, *Information on the security situation for Afghans working with the American forces in Afghanistan* (Jun. 12, 2012), *available at* https://perma.cc/BUJ7-TBPD.

54.    And while the foreseeability of a Taliban takeover and retaliation against those seen as collaborating with foreign troops was widely known among the general public by that time, it was especially well known to Constellis and its affiliates, who had worked closely with U.S. military forces for years and had been kept abreast of the latest intelligence and likely scenarios.

### The February 2021 agreements

55.    In February 2021, during this dangerous period of U.S. troop drawdown, Constellis prepared and sent Oryx a new set of largely identical contracts (consisting of VSAs and accompanying Task Orders ("TOs")) on behalf of Constellis and each of the Defendant subsidiaries (Triple Canopy, Academi, Edinburgh, and Olive Group).

56.    On February 23, 2021, Constellis's Director of Subcontracts, Jennifer Imhoff, executed and delivered the VSAs and TOs to Oryx. *See* Exs. E & L (Triple Canopy VSA & TO); Exs. F & M (Academi VSA & TO); Exs. G & J (Edinburgh VSA & TO); Exs. H & N (Olive

Group VSA & TO).[1] Each of those documents had already been signed a few days earlier by Yousefzai as CEO on behalf of Oryx.

57.    The VSAs required Oryx to "[submit] to venue and exclusive personal jurisdiction in the federal and state courts in Fairfax County, Commonwealth of Virginia, for any dispute arising out of this Agreement," which "is governed by the laws of the Commonwealth of Virginia, excluding its conflicts of law rules." *See* Ex. E (Triple Canopy VSA); Ex. F (Academi VSA), Ex. G (Edinburgh VSA); Ex. H (Olive Group VSA).

58.    Given the known probability that the Taliban would overthrow the existing government before the VSAs and Task Orders expired in February 2022, the parties' clear intention was that any claims relating to the agreements (including each of the claims asserted here) would be brought in a court in Virginia applying Virginia law.

59.    The VSAs themselves were master agreements governing the overall relationship of the parties to them, but they did "not obligate Constellis to engage [Oryx] to perform any services or [Oryx] to perform any services, until both parties have signed a Task Order and then only for the Project specified in the Task Order." *E.g.*, Ex. E-1 § 1.2.

60.    If Oryx were to agree with any Constellis affiliate to the terms of a particular Task Order (which would, in turn, incorporate and be subject to the terms of the VSA), "only such affiliate will become a party" to that Task Order, and the Task Order would constitute "a

---

[1] Like the 2019 VSA, each of the 2021 VSAs includes an integration clause providing that it "and the Task Orders, together with all associated exhibits and schedules, which are incorporated by this reference, and NDA, constitute the complete and final agreement of the parties pertaining to the Services and supersede the parties' prior agreements, understandings and discussions relating to the Services." *E.g.*, Ex. E-1 § 10.14.

separate obligation of the Constellis entities or entity that execute(s) such Task Order and no other Constellis entity." *Id.* §§ 1.1–1.2.

61.    Each VSA required Constellis and its affiliates (respectively) to "use reasonable efforts to . . . confer with [Oryx] at regular intervals to review progress and resolve any issues relating to the services." *Id.* § 10.16.

62.    In addition, each VSA had strict provisions obligating Oryx to "at all times comply with all [applicable] federal, state, local and foreign laws, rules, and regulations," and to "acknowledge[] that [Constellis] intends [Oryx] to comply with all applicable legal and regulatory obligations *to the same extent* as if [Constellis] were performing the services contemplated under this Agreement." *Id.* § 9.1 (emphasis added). Since Oryx was expressly obligated by the contract to follow all laws, Constellis was necessarily required to equally follow all laws for the "same extent" clause to be consistent with Oryx's express obligation.

63.    The VSA also obligated Oryx to (a) sign Constellis's COBEC "prior to the award of this Vendor Services Agreement," (b) ensure that all of its personnel comply with the COBEC, and (c) to comply with the ANSI/ASIS PSC.1-2012, the management standard for quality of private security operations. *Id.* §§ 9.2, 9.10.

64.    Constellis's COBEC, which Constellis required Oryx to read and sign as a condition of the VSAs, further announced that Constellis's own "policies, procedures, and controls" had been designed "to ensure the company conforms to the standards included under the ANSI/ASIS PSC.1 Management System for Quality of Private Security Company Operations." Ex. C, 4.

65.     The PSC.1 standards, in turn, established strict rules regarding the Procurement and Management of Weapons, Hazardous Materials, and Munitions:

> The organization shall establish documented procedures and records for procurement and management of weapons, hazardous materials, explosives, and munitions, based on local and international legal and regulatory requirements and mission objectives and risks identified, including:
>
> a)   Compliance with registrations, certifications, and permits;
>
> b)   Acquisition;
>
> c)   Secure storage; . . .
>
> e)   Records regarding to whom and when weapons are issued;
>
> f)   Identification and accounting of all ammunition and weapons; and
>
> g)   Proper disposal with verification.
>
> Provision of weapons shall be for self-defense, or the defense of others, and appropriate to the task and operations in accordance with accepted weaponry used by law enforcement agencies and consistent with appropriate international and national law.

Ex. I § 9.2.5.

66.     Contemporaneous with the four February 23, 2021 VSAs, each of the four subsidiary defendants—Triple Canopy, Academi, Edinburgh, and Olive Group—executed its own single Task Order with Oryx.

67.     Each Task Order, in turn, incorporated by reference the "Procedure for Regulating Activities of Private Security Companies in Afghanistan, Chapter Three—Obligations of a Security Company" (*e.g.*, Ex. J, 6), prepared and arranged by Afghanistan's Ministry of Interior and attached to this Complaint as Ex. K ("MOI Procedures").

68.     Those MOI Procedures, which by their nature applied only to Defendants and not to Oryx, prohibited the Defendants from "keeping[,] carrying, transferring and making use of

heavy and medium weapons and heavily armored vehicles" or "keeping or using non-registered light weapons or non-registered ammunition." Ex. K, Art. 21.

69.     In addition, each Task Order explained its "background and purpose" in nearly identical terms. The Triple Canopy Task Order explained: "Triple Canopy provides protective services OCONUS[2] for USAID facilities, buildings, property and employees and their accompanying eligible household members, as well as any Diplomatic Security Services/Regional Security Officer-designated U.S. and foreign dignitaries, diplomats, officials, employees, and others. Camp Oryx will provide the logistical hub for the Afghanistan operation as well as an office which will be registered as [Triple Canopy] HQ in accordance with Afghanistan law. . . . Oryx Afghanistan shall provide complete life support, office facilities and storage to Triple Canopy and its employees residing at Kabul International Container Yard (KICY)[3]." Ex. L, 5. *See also* Ex. M, 5 (Academi TO) (same, except replacing "USAID" with "Department of State" and substituting its own name as appropriate); Ex. J, 5 (Edinburgh TO) (same as Triple Canopy, but substituting its own name as appropriate); Ex. N, 5 (same as to Olive Group).

70.     The stated purpose of these Task Orders (that is protecting USAID or State groups) or any U.S. government contract relating to the same, was inconsistent and incompatible with the possession and stockpiling of illegal heavy weapons and unregistered weapons.

71.     The Task Orders provided that for the period February 19, 2021 to February 18, 2022—i.e., extending several months after the planned withdrawal of U.S. troops from Afghanistan—Oryx would provide furnished living quarters and office space along with

---

[2] Outside the Continental United States.

[3] This is the previous name of Camp Oryx.

associated services (e.g., internet, meals, and laundry), on-site security, parking spaces, and "use of secured storage inside warehouse and laydown yard" as auxiliary support to these "protective services" contracts, as regulated by the U.S. government and Afghan government (*E.g.*, Ex. J, 5–6).

72.     Altogether, Defendants agreed to pay for room for 20 individuals, meals for 12, access to a single shared office, and permission to keep 22 containers in the designated area as follows:

|  | Triple Canopy | Academi | Edinburgh | Olive Group |
|---|---|---|---|---|
| **Single Occupancy Room** | 2 | 2 | 2 | 2 |
| **Open-Bay Occupancy Room (per person)** | 3 | 3 | 3 | 3 |
| **Container Laydown (each)** | 12 | 1 | 4 | 5 |
| **Casual Meals (meals only/per person)** | 3 | 3 | 3 | 3 |
| **Helipad** | 1 | - | - | - |
| **¼ Monthly Office Rental** | 1 | 1 | 1 | 1 |

73.     Finally, each Task Order provided that "[i]n the event of a Force Majeure, defined as Acts of God, Civil Unrest, . . . Military Actions or other events outside the control of the parties hereto, that affects the performance of the work under this Order," the parties would "cooperate to *mitigate the impact* of the Force Majeure by all reasonable means and negotiate in good faith to reach agreement or alternative means to continue performance of the work under this Order." *E.g.*, Ex. J, 4 (emphasis added).

74.     Although not explicitly named, on information and belief it was implicitly understood and intended by all parties that Oryx was acting on behalf of the owner of the real property at Camp Oryx; permission from Oryx would mean nothing to, and have no value for, the Defendants unless it could also convey that same permission from the actual property owner.

For that reason, the property owner was intended as a third-party beneficiary of the VSAs and respective Task Orders.

75.     On June 14, 2021, the parties executed modifications to each of the original Task Orders ("TOMs") to add funding for withholding tax and to correct a previous mathematical error. Ex. O (Triple Canopy TOM); Ex. P (Academi TOM); Ex. Q (Edinburgh TOM); Ex. R (Olive Group TOM).

76.     The Triple Canopy TOM had another material change: it noted that the project was part of Prime Contract Number W52P1J19D0005, and it inserted into the task order various FAR clauses, including 28 CFR 52.225-26, Contractors Performing Private Security Functions Outside the United States (Oct 2016). Ex. O, 4.

77.     These provisions further obligated Triple Canopy to ensure compliance in various ways with applicable laws relating to weapons. *See* Ex. S, 4 (Contract W52P1J19D0005) (requiring them to provide Security Support Services in compliance with the Performance Work Statement (PWS) dated 21 February 2018); *id.* at 6 ("Triple Canopy shall comply with all host nation laws"); Ex. T § 4.3.3 (the PWS referenced in the Prime Contract) (noting that their "authorization to possess weapons and ammunition may be suspended or revoked for noncompliance with US or Host Nation laws"); *id.* § 4.8.1 (requiring them to "maintain a serialized weapons accountability list and maintain weapons accountability at all times"); *id.* § 4.8.2 (similar); 48 C.F.R. § 52.225-26(c)(2) (requiring them to comply with the laws of the host country and follow "[o]rders, directives, and instructions issued by the applicable commander of a combatant command or relevant Chief of Mission relating to weapons").

78.    According to a February 2021 invoice, the Constellis Containers were to be divvied up among the Defendant entities as follows: Olive Group (5 containers), Triple Canopy (12 containers), Edinburgh (4 containers), and Academi (1 container).

79.    However, as revealed by an internally circulated Constellis document from August 2021, the division of containers was far different in practice: Olive Group (8 containers), Triple Canopy 8 containers), a joint container for Triple Canopy and Olive Group, and 4 containers not specific to any entity.

80.    Constellis also maintained another container off the books not associated with a specific entity.

**Defendants foresee the risk to Oryx from the Taliban due to Defendants' illegal weapons**

81.    As noted above, by the time the parties executed the contracts in February 2021, the general public widely and expressly anticipated a Taliban takeover of the Afghanistan government (and of Kabul, in particular)—as well as related retaliation against those deemed to have collaborated with foreign troops—in the wake of the upcoming U.S. withdrawal from Afghanistan.

82.    Constellis and its subsidiaries, as professional PSCs with years of experience in Afghanistan working closely with the U.S. government, were more knowledgeable about the potential risks than the general public. Indeed, Constellis and its subsidiaries advertise themselves as being "best-in-class" in intelligence, security, risk assessment, and business continuity planning for such circumstances. *See* https://constellis.com/what-we-do/.

83.    At the same time, Constellis and its subsidiaries knew that they were storing unregistered light weapons as well as medium and heavy weapons at Camp Oryx in direct

violation of the MOI Procedures (Ex. K, Afghanistan_MOI_regulations), which were incorporated and part of each Task Order with Oryx (*e.g.*, Ex. J, 5).

84.    Indeed, Defendants' failure properly to account for and to register weapons, and their possession of illegal weapons, had long been an issue known to Constellis and its subsidiaries.

85.    For example, as far back as May 2019, Defendants had contemplated the risk associated with their illegal and unregistered weapons at Camp Oryx, noting that discussion of that issue "needs to be top to as above and beyond any other issue. This one will get [our] people locked up and that isn't happening whilst I have breath in my body."

86.    Likewise, in March 2020, Constellis employees openly discussed a cache of "Academi/TC Weapons @ Oryx" that were illegal and unregistered, noting trepidation that "trying to handover unregistered and unassigned weapons will be a significant issue for all concerned"; and that surrendering weapons without a formal amnesty would "risk further aggravation and likely significant penalties" from the Afghan government. Ex. U, 1.

87.    Furthermore, in an August 2, 2021 document entitled, "Ensuring Business Continuity and Extraction Strategies," Constellis acknowledged not only the threat of Taliban takeover, but the risk of a siege at Camp Oryx. Defendants expressly contemplated that both equipment and weapons at Camp Oryx were "at risk."

88.    In this "Ensuring Business Continuity and Extraction Strategies" document, Constellis acknowledged that local nationals "will most likely want to disassociate all connections to Constellis in fear of retribution from the Taliban." In other words, Defendants knew that their operations put a target on the backs of Camp Oryx, as well as Oryx Afghanistan.

89.     On information and belief, the other Defendants (Triple Canopy and Academi) created similar continuity plans, evaluating similar risks associated with their own cache of illegal weapons stored at Camp Oryx.

90.     On August 8, 2021 Defendants Constellis, Olive Group, and Edinburgh also created a "Business Continuity Plan" which directly contemplated Taliban takeover of Kabul. The express purpose of this plan was "to detail how Constellis, OG (Olive Group), and EI (Edinburgh) will ensure business continuity if Afghanistan does fall to a terrorist organization and the team need to be evacuated." Later in the plan, it stated, "[t]rigger points need to be identified to enact this document, with the gradual advance of the Taliban towards Kabul . . . ." The plan anticipated that Constellis would have approximately 48 hours to act after the fall of Bagram, before the Taliban reached the outskirts of Kabul (where Camp Oryx was located).

91.     Constellis and its subsidiaries likewise understood (a) that the discovery of these weapons by Oryx would risk damages for breach and risked Oryx informing the MOI; (b) that the MOI had authority to punish them "in accordance with the laws of Afghanistan" for possessing and failing to report these unregistered and illegal weapons by imposing fines, canceling their license, or other penalties (Ex. K, 13–15); (c) that discovery of any of these violations would jeopardize their contracts with the U.S. government (*e.g.*, Ex. S, 4); and (d) that if they turned these weapons in to the MOI (as required by law), they would lose the opportunity to save money on such weapons if they remained undiscovered when, if ever, Defendants had a subsequent opportunity to resume operations.

92.     On the other hand, Constellis and its subsidiaries understood that, if the Taliban overthrew the government and then discovered the illegal weapons after Constellis left the

country, the Taliban would view Camp Oryx as the equivalent of a U.S. military base. Given the Taliban's known antipathy to the United States and history of human rights abuses, there was a high likelihood that the owners, employees, and contractors of Oryx found onsite were likely to experience detention, torture, confiscation of their property, and even execution. But in that scenario, Constellis would suffer no adverse consequences (financial or otherwise). Indeed, if they abandoned the weapons at Camp Oryx and the Taliban did *not* discover them, Constellis believed that it might be able to retrieve those weapons later if they were ever able to return to the country.

93.    On information and belief, after considering the risks and rewards of various strategies, Constellis and its subsidiaries made the decision that subjecting Camp Oryx and its employees to the known risks of detention, torture, loss of property, and execution was better for Constellis than taking responsibility for the weapons and facing legal consequences.

94.    By August 2, 2021, various Constellis employees circulated a draft business continuity plan—for only Constellis, Olive Group, and Edinburgh—that was an "extended version" of what had been sent to their corporate offices a few weeks earlier. Ex. V, 1.[4] The communication noted "the [high] threat of insurgence either from the Taliban or even ISIS," and the need "to have mitigation plans for . . . welfare of clients, employees, and contractors at each project location [and] extraction measures in the event of Kabul falling." *Id.* at 2.

95.    Constellis understood that there were "Weapons at risk" at Oryx (*id.* at 3), but it had no plans in place to mitigate that risk (*id.* at 5). That was true, in part, because Constellis also

---

[4] On information and belief, because Academi and Triple Canopy also stored illegal weapons and/or explosives at Camp Oryx, both of those entities developed their own continuity plan or plans involving the same or a similar analysis.

worried that the Afghanistan Ministry of Interior, which was tasked with regulating possession of arms by private security companies like Constellis (*see* Ex. K (incorporated by reference into each Task Order)), was under pressure "to generate revenue by any means that they can, predominantly in the form of penalties," which could result in frozen accounts and other challenges "that will force our hand to pay with a view to pointlessly challeng[ing] later." Ex. V, 3.

96.    Six days later, on August 8, 2021, Constellis circulated a more formal version of the continuity plan. Ex. W. In this version, Constellis wrote that its plan was designed primarily to "ensure business continuity if Afghanistan does fall to a terrorist organization . . . [and] to enable Constellis to return and commence operations should the opportunity present itself." *Id.* at 4.

97.    Constellis understood that if Bagram Airfield were to fall to the Taliban "the Taliban would be at the outskirts of Kabul within 48Hrs, based on the current rate of advance and previous district trends, when advancing." *Id.* at 5.

98.    With regard to Oryx, Constellis acknowledged that "Olive [Group] currently use Oryx to store over 1000 weapons," noting that "[i]f the option to leave Afghanistan is acted upon the weapons will need to be handed to the MOI, destroyed in place or left at risk *to facilitate a return of Constellis to Afghanistan.*" *Id.* at 6 (emphasis added). They noted further that "there is an IP camera at oryx that monitors the weapons are still secure" and they could provide login details "to GCOC to allow the continuous monitoring of the location, should the need to exit the country arise." *Id.*

99.     The plan also included arrangements for "Destruction of any docs deemed non essential" (*id.* at 8), but, again, offered no "Mitigation" plan for the risk to Oryx of Weapons & Ammunition theft at Oryx (*id.* at 9).

100.    All of the 22 Constellis Containers were locked and secured, and only Defendants (and not Oryx or Yousefzai) had the means to access and unlock these containers, or the knowledge of what they contained.

101.    In the final version of the Continuity Plan, circulated on August 9, 2021, Constellis noted that "[i]f corporate authorize some of the weapons [at Oryx] could be handed to the MOI, this would be assessed on age and state," but "[h]ighlighted . . . the fact any weapons handed over to the MOI would not be returned to Olive [Group] if required in the future. Decisions need to be made in a timely manner in line with Taliban advances along the Jalalabad road." Ex. W at 8 (excerpted). It also noted that there was a large amount of equipment (a list of which "is held by logistics"), and that "[a]ll equipment that can be moved will be stored at Oryx, if time permits equipment could be destroyed or handed to the MOI, [but] this would require authorization from corporate, [as] all equipment would never be returned, therefore, if required in the future all items would require purchasing again." *Id.* Again, the Continuity Plan described no mitigation strategy for Oryx. *Id.* At 12.

102.    On August 9, 2021, Aaron Edwards, Senior Director, Operations asked David Elliot, Kelvin Windsor, and Anthony Ramos, about the Camp Oryx storage. A few days later, on August 14, 2021, he followed up, stating "Given the deteriorating situation, these weapons [at Camp Oryx] are a major concern. What, if any, are our options?" Kelvin Winsor responded stating "Few options now Aaron. We will destroy if we can, looking increasingly unlikely."

103.     Recognizing the risks associated with its storage of weapons at Camp Oryx, Constellis inquired about the possibility of destroying certain items and asked Oryx personnel to test whether onsite equipment could destroy "expired weapons," beginning with the destruction of items such as helmets and body armor. Constellis did not disclose that these "expired weapons" were already stored at Camp Oryx or explain the true purpose of its desire for the test, and never proceeded to destroy any weapons at Camp Oryx.

104.     The Taliban took control of Bagram Airfield on August 15, 2021. At that point, the president of Afghanistan, Ashraf Ghani, fled the country, and the Taliban freely entered Kabul the same day.

105.     Two days after the Taliban entered Kabul, Constellis continued to recognize that a takeover of Camp Oryx by the Taliban was foreseeable. On August 17, 2021, a Constellis employee even asked, "Do we know if Oryx has been taken over by Talib?"

**Defendants abandon their cache of illegal weapons without any warning or effort to mitigate their harm in violation of the contracts and their own continuity plan**

106.     As Defendants had foreseen, the Taliban arrived at Camp Oryx on August 18, 2021.

107.     At no time during the six-day period between the circulation of its final Continuity Plan and the fall of Kabul did Defendants make any effort to warn Oryx that they had abandoned a stockpile of illegal and unregistered weapons at Camp Oryx or to try to turn the weapons into the MOI. Nor, in the three days after the fall of Kabul, did Defendants work with Oryx to mitigate the effects of the Taliban reaching Camp Oryx and finding the weapons, or have someone present to take responsibility for them and ensure Camp Oryx was not harmed.

108.    Instead, after Oryx's General Manager emailed Constellis on August 18, 2021 and informed him that, "Taliban wants to Open your containers in ORYX and they cannot Hold back any more, They just want to see what's inside . . . And they Might Forcefully Open the containers," Constellis—without any warning of what would be found in the containers—advised Oryx to tell the Taliban to break the locks as we don't know where the keys are; we left in a rush."

109.    When Taliban fighters forcibly opened the Constellis Containers, they discovered that they contained, *inter alia*, over 5,000 weapons including assault rifles (including, but not limited to, unregistered M4s and Kalashnikovs), pistols (including, but not limited to, unregistered Beretta M9s), a heavy machine gun (DShK 12.7mm), PKM machine guns, explosive munitions and launchers (including, but not limited to, rocket-propelled grenades (RPGs), 82mm mortars, mortar tubes, and landmines), and ammunition.





*Constellis Container with DShK heavy*
*machine gun and mortar tubes (Ex. X)*

*Constellis Container with 82mm Soviet*
*mortars and 73mm RPGs (Ex. Y)*

110.    Upon discovering these illegal and/or unregistered weapons, including war-caliber explosives, and at the Taliban's request, Oryx sought proof of registration of the weapons from Constellis.  But Constellis could not provide a valid registration under either the former Afghan regime or under the Taliban government. Instead, Constellis advised Oryx to review the *company* licenses they had left in the villa "showing all legitimate operational registration [of the companies, not the weapons] with MOI." However, in addition to not proving the weapons were lawfully registered, these licenses proved the *opposite*: as private security companies, none of the Defendants were licensed to carry heavy weapons such as DShK 12.7mm, much less *explosives* like RPGs.

111.    Nevertheless, Yousefzai replied, "I will try to convey these to them and see what happens, For now they have my team on camp arrest, I wish you guys told me about stocking firearms at the camp."

112.    Due to Oryx's inability to prove authorization or a legitimate reason for Constellis's massive stockpile of unregistered firearms and illegal heavy weapons, the Taliban reached the natural conclusion that Camp Oryx was being used by Constellis or others as a clandestine U.S. military base. Writing in 2025, the Kabul province director of the Taliban's General Directorate of Intelligence (GDI) affirmed:

> After the camp was conquered, and during the inspection, a significant quantity of various types of weapons was discovered. These included roadside mines, RPG launchers, several types of American-made PK machine guns, and a variety of concealed weapons. On this basis, the Military Council of the Islamic Emirate and the leadership of the General Directorate of Intelligence determined that the camp had been used as a full-scale U.S. military base. All equipment was declared war booty and transferred to the public treasury, the property of the camp was seized, and it was handed over to the administration of the Islamic Emirate, specifically to the General Directorate of Intelligence . . . .

113.    After seizing the materials it found in the Constellis Containers and the entire Oryx Camp, the Taliban prohibited anyone from entering Camp Oryx and took at least four members of Oryx's staff into custody. One employee was confined to a shipping container for two months and forced to endure harsh conditions with limited access to food and water. That employee passed away soon after his detainment and, upon information and belief, his death was a direct result of the torture he had endured at the hands of the Taliban. Another Oryx employee was beaten and tortured by the Taliban due to his affiliation with Camp Oryx, which the Taliban believed (according to Taliban representatives' statements) to be a U.S. government military facility due to the illegal weapons stockpiled there by Constellis.

114.     Untroubled by the responsibility it bore for Oryx's predicament, and ignoring the requirement in each Task Order that the parties would "cooperate to mitigate the impact of [a] Force Majeure by all reasonable means and negotiate in good faith to reach agreement or alternative means to continue performance of the work under this Order," Ex. J, 4, Constellis washed its hands of the situation it created, casually notifying Oryx on August 25, 2021 that it was terminating the VSAs and Task Orders. It added the patronizing note that "[t]his termination is not a reflection on your performance."

115.     Yousefzai, on behalf of Oryx, replied immediately: "This is not acceptable as you have stored firearms in your container, without declaring in the contact [sic], and now the Taliban have taken over my camp, jailed my personnel, and sized [sic] all vehicles assets in the camp, THIS IS ALL FOR THE FACT THAT YOU STORED FIRE ARMS weapon in the containers without declaring it on the contract or with Oryx." He later begged Constellis to "Please send someone to Oryx so they can take responsibilities for this and allow us to take back our assets [and] release our personnel . . . ."

116.     Despite these pleas, Constellis never sent anyone to take responsibility for the contents of the Constellis Containers, nor explained to the Taliban that Camp Oryx was not a military facility. Nor did Constellis ever work with Oryx, as required by the relevant contracts, or otherwise try to mitigate the impact of the Taliban's discovery of their illegal and unregistered weapons. Instead, a Constellis employee merely chided Yousefzi over email, stating, irrelevantly, that Yousefzi was aware that the Defendants stored some *registered* firearms that had been *inspected* by the MOI—as if registered and inspected small firearms had caused the crisis.

117.    Due to the presence of Constellis's thousands of illegal weapons and explosives at Camp Oryx, the Taliban continues to hold Camp Oryx and, upon information and belief, has converted the property into a religious school and/or a Taliban training academy.

**A Taliban court rejects Yousefzai's claim and deems Camp Oryx forfeited as a result of the stockpile of Constellis weapons found there**

118.    Seeking to mitigate the harm caused by Defendants' breach, Plaintiff Yousefzai, as the owner of the real property on which Camp Oryx was situated, made a last-ditched appeal to a Taliban court for the return of his property. Through counsel, Yousefzai argued that the weapons found by the Taliban had been placed there by Constellis and its subsidiaries without permission and noted that the contracts did not permit the storage of illegal weapons and explosives or unregistered light arms.

119.    In a "definitive and final ruling," the Taliban court rejected Yousefzai's arguments because he could not "present the owner or a legal representative of Constellis" to verify his claims—claims that Constellis denies to this day. As a result, the Taliban court affirmed that "[a]ll equipment, materials, and vehicles on Camp Oryx, including Camp Oryx itself . . . are to be confiscated by the Islamic Emirate, particularly the Directorate of Intelligence . . . ."

120.    After the ruling, as punishment for merely presenting Yousefzai's claims to the court, the attorney for Yousefzai was kidnapped, beaten, and tortured by the Taliban's General Directorate of Intelligence.

121.    Notably, the Taliban inspected other Oryx sites around Kabul, including Cohan Village. Because there was nothing illegal or unauthorized stored there, the Taliban did *not* seize the property, and the site continues to operate profitably without governmental interference.

This proves that Camp Oryx was seized only because of Constellis's unregistered firearms, ammunition, and illegal heavy weaponry at Camp Oryx, which led the Taliban to believe it was a military facility.

### Count I – Breach of Contract
### (By Oryx against each Defendant)

122.    Plaintiffs specifically incorporate by reference and realleges paragraphs 1 through 85 as if fully set forth herein.

123.    Each Defendant entered into an agreement with Oryx that consisted of the following documents: (i) the VSAs (Exs. E, F, G, and H), which incorporated by reference (ii) the COBEC (Ex. C); (iii) ANSI/ASIS PSC.1-2012 (Ex. I); (iv) the Task Orders (Exs. J, L, M, and N); (v) the Task Order Modifications (Exs. O, P, Q, and R); which in turn incorporated (vi) the MOI Procedures (Ex. K); and in the case of Triple Canopy alone, (vii) Prime Contract Number W52P1J19D0005 (Ex. S); (viii) the PWS (Ex. T § 4.3.3); and (ix) 48 C.F.R. § 52.225-26(c)(2).

124.    Collectively, these agreements established that Triple Canopy would have the right to access and store items in 12 containers at Camp Oryx; Academi would have the right to access and store items in 1 container at Camp Oryx; Edinburgh would have the right to access and store items in 4 containers at Camp Oryx; and Olive Group would have the right to access and store items in 5 containers at Camp Oryx.

125.    The agreements also, collectively, made clear that none of the Constellis subsidiaries would use or were permitted to use the containers for anything other than purposes consistent with the a "logistical hub" for a legitimate, U.S.-sanctioned protective mission to "provide[] protective services OCONUS for [USAID or Department of State] facilities,

buildings, property and employees and their accompanying eligible household members, as well as any Diplomatic Security Services/Regional Security Officer-designated U.S. and foreign dignitaries, diplomats, officials, employees, and others" which will be accomplished "in accordance with Afghanistan law."

126.    These documents clearly, unambiguously, and repeatedly established the mutual shared intent of the parties to ensure that the parties complied with all relevant laws and regulations, including specifically the laws governing accounting for, possessing, registering, and reporting weapons and explosives.

127.    Thus, while these agreements granted Defendants a limited and conditional right to access and use Oryx's premises and facilities, those access rights did not include, and could not reasonably be construed to include, the right to use Oryx's facilities to stockpile illegal and unregistered weapons and explosives.

128.    No agreement was ever modified to permit such a right (*see* Ex. E § 10.14 (modifications must be in writing and signed by both parties)); and Oryx never waived the right to condition Defendants' license to use its premises on compliance with the applicable laws (*see id.* § 10.7 (waiver must be in writing and signed)).

129.    Each agreement with each Constellis Defendant required the appropriate Defendant to "use reasonable efforts to . . . confer with [Oryx] at regular intervals to review progress and resolve any issues relating to the services." *E.g.*, Ex. E § 10.16.

130.    Each agreement, read together with its respective task order, authorized only one Constellis affiliate the right to access a specific number of containers for storage, and expressly prohibited any interpretation that would extend that right to other affiliates. *Id.* § 1.1.

131.     Finally, the agreements obligated the parties, in the event of Force Majeure such as civil unrest or military action, to "cooperate to mitigate the impact of the Force Majeure by all reasonable means." *E.g.*, Ex. J, 4.

132.     Each agreement provided that this claim would be brought in a Virginia Court and that Virginia law would apply.

133.     Defendant Constellis and its subsidiaries Triple Canopy, Academi, Edinburgh International, and Olive Group, materially breached the 2021 VSAs by engaging in the following acts and omissions (among others), each of which constitutes an independent breach:

a.    **Unlawful and Unauthorized Use / Ultra-Hazardous Misuse of Facilities.** Defendants stored, maintained, and/or caused to be stored and maintained a substantial cache of illegal and/or unregistered weapons (and related items) on Oryx's property and within Oryx's facilities, despite lacking any contractual authorization to use Oryx's facilities for such purpose, despite contract terms requiring the parties to abide by Afghan law regarding weapons, and despite the obvious legal and security consequences for Oryx.

b.    **Failure to Remove or Mitigate During Known Taliban Takeover Risk.** As the Taliban takeover unfolded and the risk of hostile seizure became acute and obvious, Defendants failed to remove the weapons; failed to secure lawful disposition; failed to inform Oryx so that Oryx could mitigate or protect its property; and failed to take reasonable measures to eliminate or reduce the danger.

c.    **Failure to Confer / Resolve Critical Issues.** Defendants failed to confer with Oryx, failed to coordinate on a critical and dangerous operational issue arising from Defendants' use of Oryx's facilities, and failed to use reasonable efforts to resolve issues relating to its storage and use of the facilities, despite contractual obligations requiring such coordination and issue resolution.

d.    **Concealment and Refusal to Take Responsibility in Recovery Proceedings.** After the weapons were discovered by Taliban forces and Oryx sought redress, Defendants refused to take responsibility, and thereby prevented mitigation and directly contributed to the confirmation and finalization of the taking.

134.     At the time of contracting, it was reasonably foreseeable—and within the parties'
actual contemplation—that storing illegal weapons at a camp facility in Afghanistan created an
extreme risk of:

   a.  Allegations of collaboration with foreign intelligence or armed groups;
   b.  Accusations of espionage or sabotage;
   c.  Execution or torture by hostile forces;
   d.  Confiscation or seizure by hostile forces;
   e.  Permanent deprivation of the facility and associated operational assets; and
   f.  Irreparable harm not readily remediable through ordinary contract remedies.

135.     Defendants' further breached the contract due to (1) the storage of an off the
books container and (2) the allocation of containers to Defendant entities that were inconsistent
with the allocation of containers per the Task Orders and Task Order Modifications.

136.     Defendants' breaches were achieved by their own malfeasant, reckless, and/or
negligent acts and omissions, that is the stockpiling and storage of, and failure to remove and
disclose and relinquish to government authorities, unregistered and illegal weapons at Camp
Oryx.

137.     Defendants' breaches were a direct and proximate cause of Oryx's damages,
including but not limited to the permanent loss of profits from Camp Oryx and associated
property interests, facilities, and operational assets.

138.     The damages suffered by Oryx were the natural and probable result of
Defendants' breaches and were foreseeable and within the parties' actual contemplation at the
time of contracting and when there was still time to mitigate the harms, particularly given the
contractual emphasis on legal compliance, security risks, and irreparable harm in Afghanistan.

139.    Defendants' conduct constituted willful misconduct and/or gross negligence as those terms are understood under Virginia law and as contemplated in the 2021 VSAs' risk-allocation and limitation-of-liability provisions; accordingly, any contractual limitations on consequential damages do not bar Oryx's recovery of the full measure of its losses.

140.    As a direct and proximate result of these breaches, Oryx was deprived of a perpetual profit stream from its business in an amount to be proven at trial, but believed to be no less than $19,500,000, representing (i) the present value of lost future profits of at least $1,000,000 annually and continuing indefinitely, which is believed to be at least $15,000,000; and (ii) past lost profits of at least $4,500,000 since August 18, 2021.

### COUNT II – Breach of Implied Covenant of Good Faith and Fair Dealing
### (By Oryx against each Defendant)

141.    Plaintiffs specifically incorporate by reference and realleges paragraphs 1 through [preceding paragraph] as if fully set forth herein.

142.    Each of the relevant agreements between the parties contained an implied covenant of good faith and fair dealing requiring Defendants to exercise contractual rights and discretion honestly, fairly, according to custom, and in a manner that did not deprive Oryx of the benefit of the bargain.

143.    Each agreement provided that this claim would be brought in a Virginia court and that Virginia law would apply.

144.    While Defendants may have had authority to use Camp Oryx, their authorized use was limited to compliance with the provisions of the contract and local laws. Their acts of bringing and storing, and failing to remove and relinquish, illegal and unauthorized weapons at Camp Oryx was in bad faith.

36

145.    Defendants exercised substantial discretion and control concerning the manner in which they used Oryx's facilities, including what they stored, how they stored it, whether they disclosed hazards, and whether they cooperated in remediation.

146.    Defendants breached the implied covenant by, among other things:

   a.    knowingly using Oryx's facilities for the storage of illegal weapons and explosives;

   b.    knowingly abandoning the weapons during a hostile takeover when the risk of confiscation of both movable and immovable property was obvious;

   c.    knowingly refusing to mitigate, disclose, or cooperate in recovery efforts when mitigation was reasonably possible, including after Yousefzai expressly requested Defendants' assistance in mitigating the harm; and

   d.    prioritizing its own financial and reputational interests (e.g., the prospect of fines, or the remote possibility of recovering the weapons later) over Oryx's property rights and its employees' personal security.

147.    Defendants' bad-faith conduct deprived Oryx of one of the essential understandings and benefits of its agreements—its customer's lawful, safe, and non-catastrophic use of Oryx's property—and directly contributed to the permanent loss of the profits from facility, which was the natural and probable consequence of conduct by Defendants that was reasonably foreseeable (and, indeed, was actually contemplated by the parties).

148.    As a direct and proximate result of these breaches, Oryx was deprived of a perpetual profit stream from its business in an amount to be proven at trial, but believed to be no less than $19,500,000, representing (i) the present value of lost future profits of at least $1,000,000 annually and continuing indefinitely, which is believed to be at least $15,000,000; and (ii) past lost profits of at least $4,500,000.

## COUNT III – Trespass
### (By Oryx and Yousefzai against each Defendant)

149.     Plaintiffs specifically incorporate by reference and realleges paragraphs 1 through 80 as if fully set forth herein.

150.     By virtue of the various agreements, Defendants possessed a limited and conditional license to access the real property on which Camp Oryx was situated, which was owned by Yousefzai and operated under an implicit lease by Oryx before its seizure by the Taliban.

151.     By exceeding the scope of the license reflected in the agreements through the storage of (1) of unregistered weapons and illegal heavy weapons and explosives at Camp Oryx, and (2) such items in a container reserved for a different Constellis affiliate, Defendants became trespassers and interfered with Oryx's and Yousefzai's exclusive possessory interest in the property.

152.     As a direct and proximate result of Defendants' trespass, (a) Oryx was deprived of a perpetual profit stream from its business in an amount to be proven at trial, but believed to be no less than $19,500,000, representing (i) the present value of lost future profits of at least $1,000,000 annually and continuing indefinitely, which is believed to be at least $15,000,000; and (ii) past lost profits of at least $4,500,000 since August 18, 2021; and Yousefzai suffered the total loss of the real property, vehicles and chattels, and buildings comprising Camp Oryx, with value to be determined at trial, but believed to be no less than $17,016,695.00.

## COUNT IV – Negligence
### (By Oryx and Yousefzai against each Defendant)

153.     Defendants owed Plaintiffs a duty, independent of contract, to exercise reasonable care in their use of Plaintiffs' land and facilities in order to avoid creating an unreasonable risk of

harm to the leaseholder or landowner; to avoid creating a dangerous condition on the land; and to refrain from using the property in a manner that foreseeably subjected it to destruction, seizure, or permanent deprivation.

154.    Defendants breached that duty by storing illegal and unregistered weapons on Plaintiffs' property; by leaving those weapons in place during the Taliban takeover; by failing to warn, remove, or mitigate; and by refusing to cooperate in a manner necessary to prevent permanent loss.

155.    The discovery of illegal weapons by Taliban forces, the resulting seizure, and the final confirmation of the taking were reasonably foreseeable consequences of Defendants' conduct at Camp Oryx. Defendants knew that they were subject to numerous overlapping and reinforcing laws, rules, and regulations that prohibited them from possessing illegal (and unregistered) weapons and explosives; that required them to keep detailed accountings of all weapons they do possess; and to report illegal weapons to the Afghan Ministry of Interior.

156.    For more than a year, Defendants had openly discussed among themselves the fact that they possessed illegal weapons that they were required to report and surrender to the Afghan Ministry of Interior, but they chose not to do so because they feared being subject to substantial penalties for doing so, and because they did not want to have to purchase replacement weapons.

157.    In addition, Defendants were acutely aware for months of the likelihood that the Taliban would take over the Afghan government, that they very likely would search places associated with U.S. contractors like Camp Oryx, and that the discovery of a stockpile of illegal and unregistered weapons and explosives by Taliban forces would almost certainly expose the

owner of that property to serious consequences, including a substantial risk of torture, execution, and forfeiture of his property

158.    As a direct and proximate result of Defendants' negligent acts and omissions, Plaintiff Oryx was deprived of a perpetual profit stream from its business in an amount to be proven at trial, but believed to be no less than $19,500,000, representing (i) the present value of lost future profits of at least $1,000,000 annually and continuing indefinitely, which is believed to be at least $15,000,000; and (ii) past lost profits of at least $4,500,000 since August 18, 2021; and Plaintiff Yousefzai suffered injury to his property, including the total loss of Camp Oryx (the real property as well as any improvements, vehicles, and other property) in an amount to be proven at trial, but believed to be no less than $17,016,695.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.    For all counts:

   a.    Plaintiff Oryx request damages for its lost income stream in an amount to be proven at trial, but believed to be no less than $19,500,000, representing (i) the present value of lost future profits of at least $1,000,000 annually and continuing indefinitely, which is believed to be at least $15,000,000; and (ii) past lost profits of at least $4,500,000.

   b.    Plaintiff Yusefzai requests damages for (i) the lost value of its land in an amount to be proved at trial, but believed to be no less than $9,617,920; and (ii) the lost value of his improvements and lost personal property in an amount to be proven at trial, but believed to be no less than $7,398,775.

2.    Attorneys' fees, costs, and any other relief the court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs request a trial by jury on any and all issues so triable.

Respectfully submitted,

Dated: February 23, 2026

By: _/s/ Timothy R. Clinton_

**CLINTON & PEED**
Timothy R. Clinton (Va. Bar No. 70902)
Matthew J. Peed (*pro hac vice forthcoming*)
Rebecca A. Carter (*pro hac vice forthcoming*)
1775 Eye Street NW, Suite 115r0
Washington, DC 20006
(202) 919-9491
tim@clintonpeed.com
matt@clintonpeed.com
rebecca@clintonpeed.com

*Counsel for Plaintiffs*